U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 APR -3 PM 1:26

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JOSHUA HANDVERGER,          )
                            )
        Plaintiff,          )
                            )
    v.                      )          Case No. 5:08-cv-246
                            )
CITY OF WINOOSKI, VERMONT,  )
                            )
        Defendant.          )

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Docs. 70, 71)

This matter arises out of the September 30, 2008 termination of Plaintiff Joshua

Handverger by the City Council for Defendant City of Winooski, Vermont ("Winooski").

Before the court are the parties' cross motions for summary judgment (Docs. 70, 71) with

regard to Mr. Handverger's Third Amended Complaint. Mr. Handverger alleges

Winooski failed to accommodate his religious belief in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1), and Vermont's Fair Employment

Practices Act ("FEPA"), 21 V.S.A. § 495(a)(1).[1] He also asserts claims under 42 U.S.C.

§ 1983, alleging that Winooski deprived him of his constitutionally protected property

and liberty interests without procedural due process.

Mr. Handverger is represented by John L. Franco, Jr., Esq. Winooski is

represented by Kaveh S. Shahi, Esq.

---

[1] Winooski claims that to the extent Mr. Handverger is attempting to relitigate state law claims
other than FEPA, those claims are barred because they have been previously litigated in state
court. (Doc. 70 at 6.) In response, Mr. Handverger has clarified that the only state law claim he
asserts is a violation of FEPA.

For the reasons set forth below, the court hereby DENIES Mr. Handverger's motion for summary judgment and GRANTS in part and DENIES in part Winooski's motion for summary judgment.

## I.     Factual and Procedural Background.

### A.     Undisputed Facts.

Joshua Handverger was hired as Winooski's City Manager after his contract with the Town of Sutton, Massachusetts as its town administrator was not renewed. He and Winooski entered into a three-year Employment Agreement (the "Employment Agreement"), executed on October 3, 2007 and effective October 1, 2007 which provided in relevant part:

> Employee agrees to remain in the exclusive employ of Employer until October 1, 2010, and neither to accept other employment nor to become employed by any other employer until said termination date, unless said termination date is affected as hereinafter provided.
>
> . . .
>
> During the first year, the employee is considered an "at will" employee, and just cause is not required by the employer to terminate the employee. After the first anniversary of the execution of the original contract, employer is obligated to determine "just cause" prior to terminating employee.
>
> . . .
>
> All provisions of the City Charter . . . as they now exist or hereafter may be amended, also shall apply to Employee as they would to other employees of the Employer, in addition to said benefits enumerated specifically for the benefit of Employee except as herein provided.

(Doc. 71-5 at 1-2, 6.)

Winooski's City Charter (the "Charter") provides that the City Manager must be appointed for "an agreed-upon term," 24 V.S.A. App § 17-3.2, and may be removed from office by the City Council as follows:

> Procedure. The council may remove the city manager from office in accordance with the following procedures.
>
> (1) The council shall adopt by affirmative vote of a majority of all its members a preliminary resolution which must state the reasons for removal and may suspend the manager from duty for a period not to exceed 45 days.

2

A copy of the resolution shall be delivered promptly to the city manager. In the event of suspension, the city council may assume the duties of the manager or appoint an interim manager.

   (2) Within five days after a copy of the resolution is delivered to the manager, the manager may file with the council a written request for a public hearing. This hearing shall be held at a council meeting not earlier than 15 days nor later than 30 days after the request is filed. The manager may file with the council a written reply not later than five days before the hearing.

   (3) The council may adopt a final resolution of removal, which may be made effective immediately by affirmative vote of a majority of all its members at any time after five days from the date when a copy of the preliminary resolution was delivered to the manager, if the manager has not requested a public hearing, or at any time after the public hearing if one has been requested.

*Id.* § 17-3.3(a).

   On September 19, 2008, eighteen Winooski employees, officials, and department heads signed a letter, on City of Winooski letterhead, calling for Mr. Handverger's resignation. The letter indicated that the signatories had lost the ability to work with Mr. Handverger as City Manager and asserted, among other things, that they believed he lacked "[p]rofessionalism" and "maturity," "[r]easonable ethical and moral standards required for leadership," "[b]asic people or managerial skills," and "[f]iduciary responsibility." (Doc. 70-6 at 1.) The letter also stated that "[b]ecause of your lack of understanding of the City's true financial situation and your refusal to ask questions or listen to the staff's advice prior to making important decisions, both financial and otherwise, you have made some grave errors that will have lasting impacts on this community." *Id.* at 2. The signatories noted that many of them had individually approached Mr. Handverger during the preceding twelve months to urge him to adopt a "more team oriented style and compromising approach," *id.* at 1, and stated that their advice had been ignored. They demanded Mr. Handverger's immediate resignation and advised Mr. Handverger that they would issue a press release if he did not tender it. In response, Mr. Handverger refused to resign. The signatories to the letter jointly issued a press release on the same day, stating that:

3

During the "public comment" period of the regular City Council meeting on September 22, 2008, the undersigned department heads for the City of Winooski will present to the Mayor and City Council a copy of a letter that had been delivered to the City Manager, demanding his immediate resignation.

(Doc. 70-1.) In response, Mr. Handverger contacted members of the City Council and discovered that three of the five City Council members would likely not support his continued employment.

At the City Council's September 22 meeting, Mr. Handverger was represented by Attorney Franco who acted as his primary spokesperson.[2] Mr. Handverger's removal was raised during the public comment period during which the employees' letter was presented and read aloud. Mayor Michael R. O'Brien, a member of the City Council, asked Mr. Handverger if he wished to respond. Mr. Handverger replied that he was surprised by the accusations in the letter, that he believed the letter included some "false statements," and that he would welcome a discussion of the referenced concerns with the department heads at a "later point." (Doc. 71-3 at 00:13:45) (Winooski City Council television broadcast Sept. 22, 2008). The City Council subsequently opened the floor to the public, during which, among other comments, numerous Winooski employees and members of the public addressed the City Council in support of Mr. Handverger's removal. While some members of the public and certain employees spoke in support of Mr. Handverger, many more spoke in favor of his removal including members of the public who also criticized the City Council for its handling of the matter. The meeting was at times raucous but the City Council quickly restored order.[3]

After the public comment portion of the meeting concluded, Attorney Franco addressed the City Council, asking "[w]hen are you proposing to have a hearing about

---

[2] The court has raised the issue of whether Attorney Franco is likely to be called as a witness in this matter and was advised by the parties that it is unlikely that he would be called to serve in that capacity because the facts in which he is involved are undisputed.

[3] At the end of the September 22 meeting, Mr. Handverger was escorted from the building by police who feared for his safety due to the crowd.

whether or not [Mr. Handverger] ought to be removed?" *Id.* at 00:40:50. Mayor O'Brien responded:

> [T]his is not a hearing, we have just heard from employees, from citizens, both ways. I think we have to come to a decision tonight, a final decision. We have discussed in executive session where we were going, [but] we have not made a decision in public session as to how we are going to move forward.

*Id.* at 00:40:50. Attorney Franco responded that a determination regarding Mr. Handverger's removal would be inappropriate, because no proceeding regarding Mr. Handverger's removal had been noticed by the City Council as part of its agenda. He nevertheless stated that if the City Council was going to take up the issue of Mr. Handverger's removal, Mr. Handverger would prefer that the City Council proceed in open session rather than in executive session. The City Council agreed to discuss Mr. Handverger's removal in open session.

Thereafter, Attorney Franco stated that to legally remove Mr. Handverger under the Charter, the City Council would be required to vote for a preliminary removal resolution, afford Mr. Handverger five days to request a hearing, and then schedule a hearing no less than fifteen and no more than thirty days after his request. Mayor O'Brien replied that the City Council would defer to the City Attorney William O'Brien, as to the Council's legal obligations. Attorney O'Brien stated that because Mr. Handverger's contract with Winooski specified that he was an at-will employee until October 1, 2008, the City Council was not required to comply with the Charter. However, he further stated that "despite that, I would recommend that you provide [Mr. Handverger] the charter protection, which says a public hearing if he should so request." *Id.* at 1:44:34.

In response, the City Council decided to vote on a preliminary removal resolution in accordance with the Charter. Before voting on the resolution, the City Council gave Mr. Handverger another opportunity to respond. Attorney Franco stated that "I think enough has been said for tonight" and "I want to thank the Council for agreeing to follow the procedure in the Charter, I think that is very important." *Id.* at 2:03:15. Mayor

O'Brien replied that if the City Council voted for Mr. Handverger's preliminary removal, Mr. Handverger would have five days to file a written hearing request through Attorney O'Brien, after which "we will schedule the hearing as appropriate." *Id.* at 2:04:23.

The City Council then voted in favor of the preliminary removal resolution, placed Mr. Handverger on paid suspension, and removed him from office effective September 30, 2008, unless he requested a public hearing in writing before September 28, 2008. The preliminary resolution stated in relevant part that:

> Whereas the City Council has received a copy of a letter from all department heads and assistant department heads of the City, dated September 19, 2008, indicating that they have lost the ability to continue to work with Mr. Handverger as City Manager and have demanded his immediate resignation, and

> Whereas Mr. Handverger has refused to resign, and

> Whereas, the City Council [b]elieves it is in the best interest to terminate its employment relationship with Mr. Handverger in light of the overwhelming opposition to his management style, competence, and abilities expressed by all department heads of the city, and the adverse effects it has placed upon their abilities to perform their jobs[.]

(Doc. 71-1 at ¶ 22.)

On Saturday, September 27, 2008, Mr. Handverger, through counsel, gave written notice of his request for a public hearing pursuant to the Charter:

> Please be advised pursuant to Winooski City Charter 24 V.S.A. Appendix § 17-3.3(a)(2) Winooski City Manager Joshua Handverger requests a public hearing on the Council's preliminary resolution of removal voted September 22, 2008.

(Doc. 70-9.) Mr. Handverger asserted that the Council's vote to suspend him violated the Employment Agreement which he characterized as requiring that any vote for suspension be preceded by ten days written notice of the charges leading to suspension. In the same letter, Mr. Handverger contended his termination was governed by the Charter. He identified a number of concerns that he wanted addressed "beforehand" including the disqualification of Attorney O'Brien from participating in the hearing due to his status as a signatory to the September 19th letter and his potential status as a witness. Mr.

6

Handverger also asked for "[d]isclosure of all *Loudermill*[4] materials to be used against him in the hearing," which he did not further describe, together with copies of specific written materials. He further requested that each of the signatories of the September 19 letter either be made available to be examined at the public hearing or be issued a subpoena by Winooski, compelling their attendance. Finally, he asked the City Council to subpoena two lawyers and an individual associated with the New England Resource Center and asked the Council to instruct one of the attorneys to bring all notes and documents relating to his hostile work environment investigation. *Id.* at 2.

At 9:09 p.m. on Sunday, September 28, 2008, City Attorney O'Brien sent Mr. Handverger an email acknowledging receipt of his request for a hearing and setting a hearing for 6:00 p.m. on Tuesday, September 30, 2008. The email advised Mr. Handverger, through his counsel, that he had waived the rights afforded to him in the Charter by acknowledging in his employment contract that he was an at-will employee for the first year of his employment. The email further stated in relevant part:

> The request is denied insofar as it attempts to invoke the provisions of the Winooski charter relating to the removal of the City Manager. These charter provisions were revoked by Mr. Handverger last year during negotiations of his employment agreement with the city. Mr. Handverger clearly understood that he was hired as an employee at will for the first year of his contract and further, that just cause was not required to terminate him during this first year, when he signed his Employment Agreement on October 3, 2007. **These contract provisions control the termination process and not the city's charter**. Accordingly, the City Council will not be issuing subpoenas for the attendance of any witnesses as you have requested. Likewise, the council did not suspend your client on September 22 but rather, **they terminated his employment effective September 30, 2008 as was their right under the Employment Agreement with Mr. Handverger.** As such, their actions have been, at all times, lawful despite your attempts to characterize them as a violation of the Employment Agreement.

---

[4] In *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), the United States Supreme Court held that a governmental employee with a protected property interest in continued employment could not be deprived of that employment without adequate notice and an opportunity to be heard. *Id.* at 542.

(Doc. 70-10 at 2.) Attorney O'Brien promised to make himself available for further consultation with Attorney Franco on September 29, 2008.

In response to Winooski's September 28, 2008 email, Attorney Franco sent Attorney O'Brien a letter objecting to the scheduled removal hearing on numerous grounds. First, he stated that Winooski intended to provide Mr. Handverger with less than forty-eight hours to prepare for the hearing, despite the Charter's requirement that any such hearing be held at a council meeting not earlier than fifteen days nor more than thirty days after the hearing request is filed.

Second, he pointed out that the hearing was scheduled during the second night of the Jewish high holiday of Rosh Hashanah and that the forty-eight hour preparation period would fall within the first night of the holiday. The letter explained that Mr. Handverger was Jewish and would be honoring the Rosh Hashanah holiday with his family in Massachusetts, as was his usual custom.[5] Attorney Franco characterized the scheduled meeting as "an outrageous insult" and likened it to requiring a Christian being required to attend a removal hearing on Christmas or Easter and stated that "[i]ndeed this may constitute evidence of a discriminatory animus and hostile work environment under Vermont's Fair Employment Practices Act." (Doc. 70-11.)

Third, Attorney Franco asserted that Vermont's Secretary of State had issued an opinion letter that the September 2, 2008 meeting was illegal for failure to follow the requirements of Vermont's open meeting law. He also asserted that it violated Mr. Handverger's Employment Agreement.

Finally, Attorney Franco challenged the timing of the September 22, 2008 preliminary resolution and its legality and contended that Winooski was required to hold a "full evidentiary hearing with sworn testimony, [and] cross-examination of witnesses." *Id.* at 2. Attorney Franco asserted: "Any way you cut it, no removal decision can take

---

[5] Winooski points to Mr. Handverger's deposition testimony that he does not celebrate Rosh Hashanah with his family if either he or they are not available. (Doc. 71-7 at 17-18.) In light of Winooski's concession that Mr. Handverger has identified a bonafide religious observance, the court does not treat this clarification as a disputed issue of fact.

effect until *after* the October 3rd one year anniversary of Mr. Handverger's 3-year contract. That means he can be removed only for just cause." (Doc. 70-11 at 2.)

Attorney Joseph Gamache responded on behalf of Winooski to Attorney Franco's letter with a faxed letter on September 30, 2008. He noted that he learned via a newscast broadcast that Mr. Handverger was out of town celebrating a religious holiday and would not attend the meeting scheduled for that evening. The letter offered to postpone the removal hearing until Mr. Handverger returned from Massachusetts, provided he agreed to the following:

> The Council would agree to continue tonight's scheduled meeting until [Mr. Handverger] returns to the State if [Mr. Handverger] agrees to waive any claims or defenses he may have against the City for not taking final action (retention/termination) regarding his employment by September 30, 2008. This means that any future action(s) taken by the City with regards to [Mr. Handverger's] employment beyond today's date will be deemed to have been timely taken. Such an agreement would maintain the legal status quo of the parties as of September 30, 2008. This proposal will allow [Mr. Handverger] to celebrate the holiday while still giving him an opportunity to address the council with no prejudice to the City.

(Doc. 70-12.) The letter stated if Mr. Handverger agreed to the proposal by 4:00 p.m., the meeting scheduled for that evening would be rescheduled upon his return to Vermont. If no response was received by that deadline, Winooski would "assume [Mr. Handverger does] not accept this offer" and would "proceed with the scheduled meeting" at 6:00 p.m. *Id.* Attorney Gamache asked Attorney Franco to call with any questions.

At approximately 4:30 p.m. on September 30, 2008, Attorney Franco sent Attorney Gamache an email, declining to agree to the offer and stating that "[n]either [Mr. Handverger] nor I will be attending for the reasons set forth in my letter of objections emailed to you earlier today." (Doc. 71-8 at 3.) After receiving Attorney Franco's response, the City Council proceeded with the hearing at 6:00 p.m. on September 30, 2008. During the meeting, Mayor O'Brien apologized for holding the hearing on a religious holiday, noted that the City had offered to reschedule it, and noted that the parties could not reach an agreement regarding the terms under which the meeting would be postponed. He further stated that:

> We have provided this opportunity for [Mr. Handverger] to present his side
> of the story concerning the charges brought forth by the employees in their
> letter of September 19, 2008 that was presented to the Council last Monday
> night and cited by this Council in the resolution passed on that date.

(Doc 71-1 at ¶ 35.) The City Council voted 3-2 to remove Mr. Handverger from his position as City Manager and to ratify the preliminary resolution of September 22, 2008 to terminate him.

### B. Disputed Facts.

The parties dispute the nature and extent of Mr. Handverger's prior notice regarding the nature and content of the September 22, 2008 City Council meeting. Mr. Handverger admits that he was aware from the Winooski employees' press release that they would be presenting a letter during the public comment portion of the meeting. He claims, however, that the press release was not an action taken by Winooski and did not reference a hearing or resolution of removal. He further claims that he had no notice that the City Council had already drafted a formal preliminary resolution to remove him.

Winooski counters that the employees' letter and press release, coupled with Mr. Handverger's conversations with City Council members, put him on notice as of approximately September 19, 2008 that his job was in jeopardy and that issues regarding his performance would be raised at the September 22, 2008 meeting. Winooski further points out that in his deposition, Mr. Handverger testified that he thought the employees' concerns were "frivolous" and that he did not think the meeting would be "well-choreographed," but rather believed that the "department heads were going to walk in and hopefully make a fool out of themselves and turn around[.]" (Doc. 70-16 at 7, 11.) Winooski argues that this supports a conclusion that Mr. Handverger's lack of preparation for the September 22, 2008 City Council meeting was a tactical decision.

The parties also dispute the truth of the allegedly defamatory statement made by Winooski employees against Mr. Handverger which were included in Winooski's preliminary resolution. Mr. Handverger claims that the City Council's preliminary resolution stating in effect that he was unfit to be City Manager was false. According to Mr. Handverger, he discovered shortly after becoming City Manager in 2007 that

10

Winooski had been suffering from significant financial problems. Mr. Handverger claims that he began to improve Winooski's financial position by instituting changes that were unpopular with some Winooski employees. For example, Mr. Handverger brought administrative proceedings against Winooski's chief of police for various performance problems, including the mishandling of city resources. Mr. Handverger contends that these changes prompted Winooski employees to attack him with false and defamatory claims which Winooski then endorsed.

In contrast, Winooski contends that Mr. Handverger did not have the level of professionalism and maturity required for a City Manager, that his management style was divisive and combative, and that any statements made by Winooski in its preliminary resolution were truthful. Winooski points to an email Mr. Handverger sent to a fellow employee regarding radio equipment which was laced with profanity and contained a crude description of various events involving Winooski officials. *See* Doc. 70-15 at 3 ("As we learned during the O'Brien family f**king... Bid processes have to be followed . . . I am also treading lightly on the legal issues with Bly. McQueen will help anyone pull my pants down, and well Billy, won't take his d*ck out of McQueen's mouth long enough to help[.]") (internal alterations supplied). Winooski contends that against this backdrop, no rational juror could conclude that Mr. Handverger's termination was the result of any wrongful activity by Winooski.

Finally, the parties dispute whether Mr. Handverger disclosed the existence of a sexual harassment lawsuit and settlement in his prior employment as a town manager in Massachusetts, and whether Winooski would have hired him had he done so. Mr. Handverger claims that he disclosed the lawsuit to Winooski's search committee. He further claims that he is unemployable as a result of Winooski's termination of his employment.

In contrast, Winooski asserts that it was unaware of either the sexual harassment lawsuit or its settlement[6] when it offered Mr. Handverger employment, and that had it

---

[6] Mr. Handverger challenges the authenticity and admissibility of what purports to be a *Worcester Telegram & Gazette News* article (Doc. 70-4) reciting the details of the sexual

known of that information, it would not have hired him. It contends that there is no evidence that Mr. Handverger's termination by Winooski has impacted his future employment in light of the sexual harassment lawsuit.

## C. Procedural History.

Mr. Handverger filed suit in state court on October 28, 2008 against Winooski and Attorney O'Brien.[7] His state court claims against Winooski asserted violations of the Winooski Charter, a review of his removal under Vt. R. Civ. P. 75, religious and/or ancestral discrimination under FEPA, breach of contract and the implied covenant of good faith and fair dealing, and violation of his procedural due process rights under 42 U.S.C. § 1983. Winooski removed the case to federal court. In an Order issued on June 3, 2009, this court declined to exercise supplemental jurisdiction over the state court claims, remanded them to the Vermont Superior Court, and stayed the § 1983 claims. *See Handverger v. City of Winooski*, 2009 WL 1564181, at *4 (D. Vt. June 3, 2009). On November 11, 2009, Mr. Handverger moved to amend his federal court complaint to allege claims of religious discrimination under Title VII and FEPA. The amendment was allowed and the federal case remained stayed.

On December 18, 2009, Mr. Handverger amended his state court complaint and narrowed his claims to extraordinary relief under Vt. R. Civ. P. 75, which allows review of "[a]ny action or failure or refusal to act of the state or a political subdivision thereof

---

harassment lawsuit and its resolution entitled "$165K claim is paid by town" and an apparent website entry about the lawsuit on diversitycentral.com. If properly authenticated, these documents may be admissible if they are not offered for their truth but to show their effect on the state of mind of the reader - the argument being that if Winooski was aware of the nature of the sexual harassment allegations and their outcome, regardless of their truth, it would not have hired Mr. Handverger. *See Smedra v. Stanek*, 187 F.2d 892, 894 (10th Cir. 1951) (hearsay statement not offered for its truth is admissible to show effect on state of mind of listener). Winooski does not respond to Mr. Handverger's challenge to the admissibility of these documents or otherwise explain why the court should consider them in ruling on summary judgment so the court does not consider them in ruling on the parties' cross-motions. *See* Fed. R. Civ. P. 56(c) (requiring evidence to be admissible if it is to be considered on summary judgment).

[7] The claim against Attorney O'Brien was dismissed and the dismissal was upheld on appeal. *Handverger v. City of Winooski*, 2011 VT 134, 191 Vt. 84, 38 A.3d 1158.

. . . if such review is otherwise available by law." Vt. R. Civ. P. 75(a). On December 21, 2009, the Vermont Superior Court dismissed Mr. Handverger's claim for extraordinary relief which sought to have him reinstated to his position with back pay.[8] On February 17, 2010, Mr. Handverger filed an uncontested motion for partial judgment in favor of Winooski which the state court granted. Mr. Handverger then appealed that partial judgment to the Vermont Supreme Court which affirmed the dismissal of his state court claims and which held that the Charter "provided no right of review for plaintiff's benefit[,]" and because the Vermont Constitution provided no alternative right of review, "review under Rule 75 is not available to plaintiff." *Handverger v. City of Winooski*, 2011 VT 130, ¶ 13, 38 A.3d 1153, 1158.

Thereafter, Mr. Handverger filed his Third Amended Complaint in this court and, after discovery, the parties cross-moved for summary judgment.

## II.   Legal Analysis and Conclusions.

### A.   Jurisdiction.

This court has jurisdiction over Mr. Handverger's federal claims pursuant to 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367(a), this court has supplemental jurisdiction over Mr. Handverger's state law claims which "derive from a common nucleus of operative fact" as his federal claims. *Shahriar v. Smith & Wollensky Restaurant Group, Inc.*, 659 F.3d 234, 245 (2d Cir. 2011). It is undisputed that Mr. Handverger's FEPA claim is based on the same underlying facts as his Title VII claim and that this court is required to apply Vermont law to the FEPA claim. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 n.4 (2d Cir. 2006) ("[T]he *Erie* doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law. Thus, we apply [state] law, even though our jurisdiction rests solely upon [28 U.S.C.] § 1367.") (internal quotations and citations omitted).

---

[8] Mr. Handverger also alleged that because he was unlawfully terminated, he was entitled to twice the value of his unpaid wages under 21 V.S.A. § 347.

## B.    Standard of Review.

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations and citation omitted). In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and deny the motion if a rational juror could decide in favor of that party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

To avoid summary judgment the non-moving party must offer more than "mere speculation and conjecture[,]" *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, only "disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

"When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inference are drawn against the party whose motion is under consideration." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011).

## C. Religious Discrimination/Failure to Offer a Reasonable Accommodation Under Title VII and FEPA.

Mr. Handverger claims that Winooski discriminated against him by failing to make reasonable accommodations for his religious observance of Rosh Hashanah during his removal hearing. Title VII, 42 U.S.C. §§ 2000e-2(a)(1) and (2), provides that an employer may not discharge or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's religion. The statute defines the term "religion" as follows:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).

FEPA similarly prohibits discrimination based on religion. 21 V.S.A. §495(a)(1).[9] Because FEPA is modeled after Title VII, decisions construing Title VII "represent persuasive authority on the proper interpretation of []FEPA." *Lavalley v. E.B. & A.C. Whiting Co.*, 692 A.2d 367, 370 (Vt. 1997); *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 9, 184 Vt. 1, 8, 955 A.2d 1082, 1088 (ruling in a reasonable accommodation FEPA case that "the standards for establishing a prima facie case under FEPA are the same as those required by Title VII of the Civil Rights Act of 1964").

Under Title VII, it is unlawful "for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977)).

---

[9] FEPA also prohibits discrimination on the basis of "ancestry." 21 V.S.A. §495(a)(1). Although in his Third Amended Complaint Mr. Handverger claims discrimination on the basis of ancestry, he has abandoned that claim, asserting that he was not discriminated in any way other than Winooski's alleged failure to accommodate "the religious Jew[ish] holiday of Rosh Hashanah on September 30, 2008[.]" (Doc. 70-1 at ¶ 27.)

A claim of discrimination for failure to reasonably accommodate religious practices requires a plaintiff to establish that: "(1) [he] held a bona fide religious belief conflicting with an employment requirement; (2) [he] informed [his] employer[] of this belief; and (3) [he was] disciplined for failure to comply with the conflicting employment requirement." *Baker*, 445 F.3d at 546. "Once a prima facie case is established by the employee, the employer 'must offer [him or her] a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship.'" *Id.* (quoting *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002)).

Winooski concedes that Mr. Handverger had a bona fide religious belief, the observance of Rosh Hashanah, and that he informed Winooski of this belief. Winooski argues, however, that Mr. Handverger's religious observance did not conflict with an employment requirement because Mr. Handverger was not required to attend his removal hearing and he was not terminated for missing the hearing. Winooski further points out that Mr. Handverger did not actually request an accommodation, he simply advised Winooski that he would not attend the September 30, 2008 hearing and thereafter refused to negotiate an alternate date that would accommodate his religious observance.

Mr. Handverger counters that, as a matter of law, Winooski's proposed accommodation was unreasonable because it was offered as an ultimatum which would have forced him to waive his claims under state and federal law. He argues that it is undisputed that there was a conflicting employment obligation and that he suffered a detriment as a result of his failure to attend the September 30, 2008 hearing.

Mr. Handverger's notice to Winooski that the scheduled September 30 hearing would conflict with his observance of Rosh Hashanah was made in the midst of numerous other demands and statements. It is nonetheless undisputed that Winooski had notice that Mr. Handverger claimed his religious observance of Rosh Hashanah prevented his attendance at the September 30, 2008 hearing. For purposes of summary judgment,

this evidence is sufficient to establish the first two prongs of Mr. Handverger's prima facie case.[10]

Mr. Handverger must further establish that as a result of the alleged failure to offer him a reasonable accommodation, he suffered a materially adverse employment action. *See Joseph v. Leavitt*, 465 F.3d 87, 90-91 (2d Cir. 2006) (employee who seeks to recover on a failure to reasonably accommodate his religious practices must demonstrate that his absence from the scheduled meetings resulted in a "materially adverse change in the terms and conditions of [his] employment."); *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) ("Examples of materially adverse employment actions include . . . significantly diminished material responsibilities, or other indices . . . unique to a particular situation."). Here, he satisfies that burden for purposes of a prima facie case by pointing out that his termination was finalized when he did not contest the allegations against him at the September 30, 2008 hearing. *See Baker*, 445 F.3d at 547 ("There is at the very least a triable issue as to whether Baker adequately informed Home Depot that his religious convictions forbade work on Sundays. The same is true as to the third prong of Baker's prima face case – that Baker was disciplined, i.e., fired – for failure to comply with the conflicting employment requirement that he work on Sundays."); *see also Poland v. Chertoff*, 494 F.3d 1174, 1181 (9th Cir. 2007) (noting that at the prima facie stage of an age discrimination retaliation case, "[t]he causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.") (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)).[11]

---

[10] For other types of discrimination claims, the courts have held that, "[a]t the prima facie case stage, the plaintiff's burden is a relatively light one." *Beckmann v. Edson Hill Manor, Inc.*, 764 A.2d 1220, 1222 (Vt. 2000) (adopting analytical burden-shifting framework for FEPA claims set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); *see also Carpenter v. Central Vermont Med. Ctr.*, 743 A.2d 592, 595 (Vt. 1999) (Plaintiff's burden of proof in the prima facie case is minimal. The Court of Appeals for the Second Circuit has repeatedly called it 'de minimus'") (citations, including internal citations, omitted).

[11] Winooski argues that Mr. Handverger has failed to establish whether the alleged failure to accommodate was the result of an official policy. However, as Mr. Handverger points out, his

Because Mr. Handverger has established a prima facie case, the burden shifts to Winooski to show either: (1) that it made a reasonable accommodation, or (2) that no reasonable accommodation could be made without undue hardship. *Baker*, 445 F.3d at 546. Winooski has not pled the affirmative defense of undue hardship. *See* Doc. 71 at 13; *see also Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208, 217 (2d Cir. 2001) (noting that "undue hardship" is an affirmative defense). The court thus does not reach the question of whether a delay that would have extended Mr. Handverger's employment beyond the one year at-will period set forth in the Employment Agreement constitutes undue hardship if it meant that Winooski could no longer terminate Mr. Handverger without just cause. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) ("To require TWA to bear more than a de minimus cost in order to give Hardison Saturdays off [for religious observances] is an undue hardship."); *Baker*, 445 F.3d at 548 ("An accommodation is said to cause an undue hardship whenever it results in 'more than a de minimus cost' to the employer") (citation omitted); *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1380 (6th Cir. 1994) ("Title VII does not require an employer to bear more than a de minimus cost in accommodating an employee's religious beliefs."). Winooski must therefore establish that the accommodation it offered Mr. Handverger was reasonable.

An offer of accommodation is "reasonable" if it eliminates the conflict between the employment requirement and the employee's religious practice, without causing the employee to "suffer an inexplicable diminution in his employee status or benefits." *Cosme*, 287 F.3d at 159, 160 (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70-71 (1986) (requiring employee to take unpaid leave for religious observance generally is reasonable because it has "no direct effect upon either employment opportunities or job status")). "In other words, an accommodation might be unreasonable if it imposes a significant work-related burden on the employee without justification[.]" *Id.* at 160. The Second Circuit has admonished that "[i]n formulating such an accommodation, both the

---

failure to accommodate claim is brought under Title VII and thus is not subject to the standards for a § 1983 claim.

employer and employee should remain flexible, with an eye toward achieving a mutually acceptable adjustment[.]" *Id.* at 158 (citing *Philbrook*, 479 U.S. at 69 & 118 Cong. Rec. 706 (1972)). "Nevertheless, to avoid Title VII liability, the employer need not offer the accommodation the employee prefers. Instead, when any reasonable accommodation is provided, the statutory inquiry ends." *Id.*; *see also Baker*, 445 F.3d at 548 ("We do note that employees are not entitled to hold out for the 'most beneficial accommodation[.]'") (quoting *Philbrook*, 479 U.S. at 69).

Winooski contends that it made a reasonable accommodation for Mr. Handverger's religious observance by offering to reschedule the September 30, 2008 hearing. This offer was subject to Mr. Handverger agreeing that "any future action(s) taken by the City with regard to [Mr. Handverger's] employment beyond today's date will be deemed to have been timely taken." (Doc. 71-1 at ¶ 31.) Winooski points out that Mr. Handverger failed to negotiate in response to Winooski's proposal and thus failed to attempt in good faith to find a mutually acceptable adjustment.

Mr. Handverger responds that he was not able to negotiate because Winooski presented him with both an ultimatum and an unreasonable deadline within which to accept it. He claims that, by agreeing to Winooski's terms, he would have forfeited his claim that the Charter entitled him to a minimum of fifteen days to prepare for a hearing after filing his written request. *See Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 634 (6th Cir. 2003) (holding that "where the conflict between an employee's religious belief and an employer's requirement can only be removed by the employee's forfeiture or expenditure of a substantial benefit available to other employees, we hold that conflict sufficient to establish a prima facie religious discrimination case exists."). He asks the court to conclude that, as a matter of law, Winooski's proposed accommodation was unreasonable.

In this case, it is not clear what rights, if any, Mr. Handverger would have waived had he accepted a rescheduled hearing date and it is equally unclear whether Winooski's offer was an ultimatum or merely an overture to further negotiation. The court's task on summary judgment is confined to "issue-finding; it does not extend to issue-resolution."

*Gallo v. Prudential Residential Servs., Ltd. P'shp*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Moreover, the Second Circuit has noted in the context of a reasonable accommodation,

"[o]rdinarily, questions of reasonableness are best left to the fact finder[.]" *Baker*, 445

F.3d at 548 (citing *EEOC v. Universal Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir.1990)

(observing that the court need "not embark on a long discussion of what is or is not

'reasonable' accommodation. Ordinarily, questions of reasonableness are best left to the

fact finder" and ruling that whether there was an available reasonable accommodation

and whether there was an undue hardship are both questions of fact)); *see also Philbrook*,

479 U.S. at 71 (remanding for factual findings on the issue of whether the offered

accommodation was reasonable); *Stone v. West*, 133 F. Supp. 2d 972, 983 (E.D. Mich.

2001) (observing that the "reasonableness inquiry must be conducted on a case-by-case

basis; 'what may be a reasonable accommodation for one employee may not be

reasonable for another.'") (citation omitted).

Because there are genuine issues of material fact regarding whether Winooski

reasonably accommodated Mr. Handverger's religious observance by offering to

reschedule the September 30 hearing if he agreed to waive any challenge to the timing of

certain future events, summary judgment is inappropriate. This conclusion is

underscored by the parties' further dispute regarding whether Mr. Handverger's

attendance at the September 30, 2008 hearing could have made a difference in

Winooski's decision whether to terminate him. Mr. Handverger claims he could have

persuaded the City Council to retain him as City Manager if he had an opportunity to

challenge the employees' allegations. Winooski contends that, in light of the

overwhelming opposition to his continued employment, Mr. Handverger's attendance at

the September 30, 2008 hearing would not have made a difference and that it was his

performance as a City Manager and not his failure to attend the meeting that gave rise to

his termination. This, too, presents a question of fact.

Because Mr. Handverger's Title VII and FEPA claims raise issues that must be

decided by the finder of fact, the parties' cross motions for summary judgment on these

claims are DENIED.

**D.     § 1983 Claim Alleging Deprivation of Property Interest Without Procedural Due Process.**

In support of his claimed violation of 42 U.S.C. § 1983, Mr. Handverger asserts that Winooski, acting under the color of state law through the actions of the City Council, violated his right to procedural due process by terminating his employment without providing an adequate hearing. Winooski contends that Mr. Handverger has not and cannot identify a protected property interest and that, in any event, it offered him an adequate pre-deprivation hearing.

"The Fourteenth Amendment to the United States Constitution provides that a State shall not 'deprive any person of life, liberty, or property, without due process of law.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 755 (2005) (quoting U.S. Const. amend. XIV, § 1). "In 42 U.S.C. § 1983, Congress has created a federal cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Id.* at 755.

To survive summary judgment, Mr. Handverger must identify "a constitutionally protected property interest in his employment[,]" and establish that he was terminated by Winooski without "notice and opportunity for [a] hearing appropriate to the nature of [his] case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). "The threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Narumanchi v. Bd. of Trs. of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988). Such interests "are not created by the Constitution but, '[r]ather, they are created and their dimensions are defined by existing rules and understanding that stem from an independent source such as state law.'" *Harrington v. Cnty. of Suffolk*, 607 F.3d 31, 34 (2d Cir. 2010) (quoting *Town of Castle Rock*, 545 U.S. at 756). "Although the substantive interest derives from . . . state law, *federal constitutional law* determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Id.* (quoting *Town of Castle Rock*, 545 U.S. at 757).

The Supreme Court has held that the "hallmark of property" is "an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan*

*v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock*, 545 U.S. at 756 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 567, 577 (1972)). "A benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Id.* Thus, while "public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process," *Gilbert v. Homar*, 520 U.S. 924, 928-29 (1997), those whose continued employment is subject under state law to "the unfettered discretion" of their employers have "absolutely no possible claim of entitlement to their positions." *Roth*, 408 U.S. at 567, 578.

The courts tread with caution in recognizing constitutionally cognizable property interests in public offices: "The decisions are numerous to the effect that *public offices are mere agencies or trusts, and not property as such*[. ] . . . [G]*enerally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right.*" *Velez v. Levy*, 401 F.3d 75, 86 (2d Cir. 2005) (quoting *Taylor and Marshall v. Beckham*, 178 U.S. 548, 577 (1900)). As a result, if a municipality retains the right to deny the benefit of continued employment in its discretion, this "suffices to defeat the existence of a federally protected property interest." *RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 918 (2d Cir. 1989).

> [T]his standard appropriately balances the need for local autonomy, with recognition of constitutional protection at the very outer margins of municipal behavior. . . . It also recognizes that the Due Process Clause does not function as a general overseer of arbitrariness in state and local . . . decisions; in our federal system, this is the province of the state courts.

*Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995).

In this case, Mr. Handverger argues that he had a property interest in continued employment because pursuant to the Charter, he was hired for a fixed term, and under Vermont law, "officers appointed for a definite term may only be removed for cause, absent express statutory authorization for removal at will." *Brennan v. Town of*

*Colchester*, 730 A.2d 601, 603 (Vt. 1999) (citing *Rutter v. Burke*, 93 A. 842, 848 (Vt. 1915)); *see also Sarvis v. Vt. State Colls.*, 772 A.2d 494, 497 (Vt. 2001) ("An employment contract for a definite term may not be terminated by the employer before the expiration of that term except for just cause."). In addition, although he concedes that his termination occurred while he was a probationary, at-will employee, Mr. Handverger contends that had Winooski followed the Charter's removal procedures, he would have passed the one year anniversary of his employment on October 3, 2008 which, in turn, would have required Winooski to have just cause to terminate his employment under the Employment Agreement. Finally, he contends that he had a protected property interest in the Charter's removal procedures as well as in those set forth in his Employment Agreement.

Winooski counters that the Charter's removal provisions authorized Mr. Handverger's removal "at any time" and at will because they did not limit the City Council's discretion in terminating Mr. Handverger to instances in which the termination was supported by just cause. Winooski points out that the Vermont Supreme Court has held that Mr. Handverger has no right to enforcement of the Charter procedures, and no recourse if they were not followed. *See Handverger*, 2011 VT 130 at ¶¶ 11-12, 38 A.3d at 1157 (observing that the Legislature has directed that the provisions of Winooski's charter be "construed liberally in favor of the city" and noting that "[w]hatever interest plaintiff had in the city charter's removal procedures, it remained subject to the balance of charter provisions that include no express remedy available to him, while expressly precluding any appellate review."). Against this backdrop, Winooski contends no protected property interest may be found. The court agrees.

The Charter's removal provisions state that the City Council shall follow certain procedures for removing the City Manager but they ultimately provide that the City may adopt a final resolution of removal by a vote of a majority of all its members "at any time" after a hearing. While there is a requirement that the City state its reasons for the removal, there is no limitation on the grounds that may be stated and no ability to challenge whether the cited reasons are sufficient. In *Brennan*, the Vermont Supreme

Court held that a municipal employee with a fixed term of employment did not have "a protectable protected property interest" in her employment where the governing statute provided that she "may be removed at any time by unanimous vote of the legislative body." *Brennan*, 730 A.2d at 604-05 ("By its terms, [the city charter] provides a municipal legislature with the authority to remove commission members at will, qualified only by the requirement that the decision to remove be made by unanimous vote."). The Charter at issue in this case falls squarely within *Brennan* as it states that the City Council may remove the City Manager by majority vote of all of its members. *Id.* at 604-05. The Charter imposes no substantive limitations on the City Council's ultimate and unfettered discretion to remove the City Manager and thus creates no constitutionally protected property interest in Mr. Handverger's continued employment. *See Codd v. Velger*, 429 U.S. 624, 628 (1977) (per curiam) (observing that because a non-tenured government employee has "no Fourteenth Amendment property interest in continued employment, the adequacy or even the existence of reasons for [the employment decision] present no federal constitutional question[.]").

Mr. Handverger contends that, even if he does not have a protected interested in his employment, he had a protected property interest in the procedures set forth in the Charter as well as those set forth in his Employment Agreement, and he is entitled to have them enforced. However, "an entitlement to nothing but procedure . . . cannot be the basis for a property interest." *Town of Castle Rock*, 545 U.S. at 749. In other words, "[a]lthough a Due Process Clause . . . interest may be grounded in state law that places substantive limits on the authority of state officials, no comparable entitlement can derive from a statute that merely establishes procedural requirements." *Cofone v. Manson*, 594 F.2d 934, 938 (2d Cir. 1979); *see also Olim v. Wakinekona*, 461 U.S. 238, 249-50 (1983) (holding that state procedures do not create a protected interest unless they "plac[e] substantive limitations on official discretion" and concluding that "[t]he Court of Appeals . . . erred in attributing significance to the fact that the prison regulations require a particular kind of hearing before the administrator can exercise his unfettered discretion."); *Hogue v. Clinton*, 791 F.2d 1318, 1324 (8th Cir. 1986) ("[P]rocedures that

do not establish any grounds upon which termination must be based do not in themselves create a property interest in employment.").

For the reasons stated above, Mr. Handverger has not and cannot identify a constitutionally protected property right in his continued employment, or a requirement that his termination be supported by just cause. The court therefore GRANTS summary judgment in Winooski's favor and DISMISSES Mr. Handverger's § 1983 claim alleging a procedural due process violation based upon an alleged property interest.

### E. § 1983 Claim Alleging Deprivation of Liberty Interest Without Procedural Due Process.

Mr. Handverger's final claim is a violation of 42 U.S.C. § 1983 based upon the alleged denial of his liberty interest in a "name-clearing hearing" after Winooski issued its preliminary resolution which Mr. Handverger claims contains false, stigmatizing statements made public in connection with the termination of his employment.

Winooski seeks summary judgment in its favor on this same claim, asserting that the statements in the preliminary resolution are either opinions or statements of fact which Mr. Handverger cannot prove are false. It further asserts that Mr. Handverger never asked for a name-clearing hearing, and that there were at least two hearings at which Mr. Handverger could have, but did not, seek to have his name cleared. Finally, Winooski argues that it would have never hired Mr. Handverger in the first instance had he disclosed the sexual harassment claims made against him in his prior employment. In this respect, Winooski contends that Mr. Handverger will be unable to establish that the absence of a name-clearing hearing damaged his career.

When terminating a public employee, "public officials do not act improperly in publicly disclosing charges against discharged employees, but they must thereafter afford procedural due process to the person charged." *Rosenstein v. City of Dallas*, 876 F.2d 392, 395 (5th Cir. 1989). "For a government employee, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of dismissal from government employment.

This type of claim is commonly referred to as a 'stigma-plus' claim." *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) (internal citations omitted).

> In order to fulfill the requirements of a stigma-plus claim arising from the termination from government employment, a plaintiff must first show that the government made stigmatizing statements about him - statements that call into question plaintiff's good name, reputation, honor, or integrity. Statements that denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession may also fulfill this requirement. A plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not prove they are false. Second, a plaintiff must prove these stigmatizing statements were made public. And third, plaintiff must show the stigmatizing statements were made concurrently in time to plaintiff's dismissal from government employment.

*Id.* (internal quotations and citations omitted).

It is undisputed that, prior to the September 22, 2008 City Council meeting, Mr. Handverger was aware that certain Winooski employees were demanding his resignation and had outlined their concerns in a letter which they presented to him. He knew that these employees intended to present their concerns during the public comment period of the September 22, 2008 City Council meeting. Mr. Handverger also knew that it was unlikely that he had the support of a majority of all of the City Council members.

At the September 22, 2008 meeting, the letter in question was read into the record and other public comments were made regarding Mr. Handverger's performance as City Manager. Both Mr. Handverger and his attorney were given an opportunity to respond to these comments, but declined to do so at the time. At the meeting, the City Council adopted a preliminary resolution which recognized the existence of the employees' September 19, 2008 letter demanding Mr. Handverger's resignation, and which stated in relevant part:

> Whereas, the City Council [b]elieves it is in the best interest to terminate its employment relationship with Mr. Handverger in light of the overwhelming opposition to his management style, competence, and abilities expressed by all department heads of the city, and the adverse effects it has placed upon their abilities to perform their jobs[.]

(Doc. 71-1 at ¶ 22.)

Thereafter, on September 27, 2008, Mr. Handverger, through counsel, gave written notice of his request for a public hearing:

> Please be advised pursuant to Winooski City Charter 24 V.S.A. Appendix § 17-3.3(a)(2) Winooski City Manager Joshua Handverger requests a public hearing on the Council's preliminary resolution of removal voted September 22, 2008.

(Doc. 70-9.) In this same letter, Mr. Handverger asked for "[d]isclosure of all *Loudermill* materials to be used against him in the hearing," which he did not further describe. He requested that each of the signatories of the September 19 letter either be made available to be examined at the public hearing or be issued a subpoena by Winooski, compelling their attendance. Finally, he asked the City Council to subpoena two lawyers and an individual associated with the New England Resource Center and asked the Council to instruct one of the attorneys to bring all notes and documents relating to his hostile work environment investigation. The City Council held a hearing on September 30, 2008 in response to Mr. Handverger's request. Neither Mr. Handverger nor his attorney attended that hearing.

In order to determine whether Mr. Handverger's § 1983 liberty interest claim is ripe for summary judgment, the court must first determine whether there are genuine issues of fact. It is undisputed that Winooski made official public statements through its City Council[12] "concurrently in time to [Mr. Handverger's] dismissal from government employment." *Patterson*, 370 F.3d at 330. Although Winooski claims the statements in the preliminary resolution were not "stigmatizing," they clearly "call into question [Mr. Handverger's] good name, reputation, honor, or integrity," *id.*, or "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other

---

[12] Winooski does not challenge its potential liability for the actions of its City Council members. *See Patterson*, 370 F.3d at 331 (observing "[a]s an initial matter, since the City concedes that its mayor is a high-ranking official with final policymaking authority in the municipal employment are at issue in this case, the City can, pursuant to § 1983, be held liable for the actions of its mayor.") (citing *Monelle v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-27 (1988)).

employment opportunities." *Roth*, 408 U.S. at 573. Certainly, the preliminary resolution cast doubt upon Mr. Handverger's competence and abilities such that potential employers exposed to the preliminary resolution would proceed with caution, if at all, in considering Mr. Handverger for employment as a city manager. *See Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006) ("We have also said that statements that 'denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession' will satisfy the stigma requirement.") (quoting *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (2d Cir.1996)). The only remaining issues are whether the statements were opinions or statements of fact; whether Mr. Handverger has adduced sufficient evidence that there were false; whether Mr. Handverger adequately requested a name-clearing hearing; and whether Winooski offered Mr. Handverger a name-clearing hearing. Of course, Mr. Handverger ultimately also bears the burden of demonstrating that the denial of a name-clearing hearing caused harm to his reputation and career, *see Rosenstein*, 876 F.2d at 398, unless he seeks damages solely for the alleged infringement of his liberty interest. *See Carey v. Piphus*, 435 U.S. 247, 260-63 (1978) (holding that when only a liberty interest is infringed, a plaintiff is generally entitled to only nominal damages or to any actual damages that were caused by the infringement).

### 1. *Opinions vs. Facts and Truth vs. Falsity.*

Winooski contends that Mr. Handverger has not raised a triable issue of fact because the statements in the preliminary resolution reflect opinions rather than facts, and thus cannot be proved or disproved. If the court concludes that the statements are factual in nature, Winooski asserts that Mr. Handverger cannot establish that the statements are false. Mr. Handverger responds that some of the statements in the preliminary resolution are factual in nature, and that he was not required to prove their falsity in order to obtain a name-clearing hearing.

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the United States Supreme Court held that, "[u]nder the First Amendment there is no such thing as a false idea.

28

However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Id.* at 339-340. Courts have thus routinely rejected claims based upon an opinion that is not susceptible to being proven true or false. *See, e.g., Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin,* 418 U.S. 264, 284 (1974) (noting that "the only factual statement in the disputed publication is the claim that appellees were 'scabs'" and finding that "[t]he definition's use of words like 'traitor' cannot be construed as representations of fact."); *Madison v. Frazier,* 539 F.3d 646, 654 (7th Cir. 2008) (noting that statements of opinion are not actionable including a reference to plaintiff that he was among the people who were "all black, and all too selfish, too afraid, and too complacent to 'practice what they preach'"); *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 223 (2d Cir. 1985) ("[W]e have held that generally one cannot be liable simply for expressing an opinion" and concluding that restaurant reviewer's opinions regarding the quality of restaurant's food are not actionable); *Yohe v. Nugent,* 321 F.3d 35, 41 (1st Cir. 2003) (police chief's statement that he believed plaintiff was suicidal was an opinion that could not give rise to a defamation claim); *Mangan v. Corporate Synergies Group, Inc.,* 834 F. Supp. 2d 199, 205 (D. N.J. 2011) (applying New Jersey law and ruling CEO's statements that company had lost faith in former CEO's leadership ability and management skills are nonactionable opinions).

Whether a statement is opinion or fact is a question of law for the court. *See Mr. Chow of New York,* 759 F.2d at 224 ("It is also clear that the determination of whether a statement is opinion or rhetorical hyperbole as opposed to factual representation is a question of law for the court."). The Second Circuit has identified factors the New York courts consider in determining whether a statement is a fact or an opinion:

> (1) An assessment of whether the specific language in issue has a
> precise meaning which is readily understood or whether it is indefinite
> and ambiguous; (2) a determination of whether the statement is capable
> of being objectively characterized as true or false; (3) an examination of
> the full context of the communication in which the statement appears;

and (4) a consideration of the broader social context or setting
surrounding the communication including the existence of any
applicable customs or conventions which might signal to readers or
listeners that what is being read or heard is likely to be opinion, not fact.

*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 403, n.7 (2d Cir. 2006) (citation and internal
quotation marks omitted).[13]

Here, the preliminary resolution contains three statements with a precise meaning
that are capable of being objectively characterized as true or false and which would not
signal to a listener that only an opinion was at issue: (1) whether in fact there was
overwhelming opposition to Mr. Handverger's management style, competence, and
abilities; (2) whether this opposition had been expressed by all department heads of the
City; and (3) whether the overwhelming opposition created adverse effects on the
department heads' ability to perform their jobs. Although each of these statements is
based upon an underlying opinion or opinions, if only a few employees and a handful of
department heads opposed Mr. Handverger's management style, competence, and
abilities, and if this opposition caused no discernible impact on their ability to perform
their jobs, the statements made could be proven false. The court thus finds that the
preliminary resolution contains statements of fact, not merely opinions. It thus turns to
whether Mr. Handverger has adduced sufficient evidence that the statements in question
are false.

While it is true that "[t]he Supreme Court has required only that a plaintiff raise
the issue of falsity regarding the stigmatizing charges – not prove it – in order to establish
a right to a name-clearing hearing[,]" *Brandt v. Bd. of Co-op Educ. Servs.*, 820 F.2d 41,

---

[13] *See also Yohe*, 321 F.3d at 41 (holding the test for fact vs. opinion under Massachusetts law
requires courts to examine "the statement in its totality and in the context in which it was uttered
or published[,]" "consider all the words used . . . [while giving] weight to cautionary terms used
by the person publishing the statement[,]" and consider "all of the circumstances surrounding the
statement."); *Frazier*, 539 F.3d at 654 (holding Illinois law requires consideration of "several
nonexclusive factors" including "(1) whether the statement has a precise and readily understood
meaning; (2) whether the statement is verifiable; and (3) whether the statement's literary or
social context signals that it has factual content.").

43 (2d Cir. 1987), at the summary judgment stage, a plaintiff must establish at least a factual dispute regarding their falsity in order to proceed with his or her claim. *See O'Neill v. City of Auburn*, 23 F.3d 685, 693-94 (2d Cir. 1994) (observing that "[a]lthough a plaintiff is not required . . . to prove the falsity of the stigmatizing statements, that being the function of the eventual name-clearing hearing, if the defendants have shown on their motion . . . that the stigmatizing statements are true, the plaintiff must at least show that there is a factual dispute.") (internal citation omitted). Although a close question, Mr. Handverger satisfies this burden by citing evidence that he challenged various City employees regarding their handling of certain financial matters which, in turn, allegedly motivated them to retaliate against him with false accusations regarding his competence, management style, and abilities.

### 2. *Request for a Name Clearing Hearing.*

Winooski argues that regardless of how the statements set forth in the preliminary resolution are characterized, Mr. Handverger never requested a name-clearing hearing. Mr. Handverger counters that applicable law does not require him to use the words "name-clearing hearing" provided it was clear that he sought an opportunity to challenge the statements made about him in the preliminary resolution.

"To establish a procedural due process claim" a plaintiff "must prove he requested and was denied a name-clearing hearing." *Crooks v. Lynch*, 557 F.3d 846, 849 (8th Cir. 2009). "Though an employee need not use the term 'name-clearing hearing' to satisfy the . . . stigma-plus-infringement test, the employee must still petition the employer in a manner that can be construed as asking for an opportunity to clear his name." *Bledsoe v. City of Horn Lake, Mississippi*, 449 F.3d 650, 653 (5th Cir. 2006); *Owen v. City of Independence, Mo.*, 445 U.S. 622, 626-29 (holding discharged public employee's letter "demanding written notice of the charges against him and a public hearing with a reasonable opportunity to respond to those charges" and his subsequent request to appeal the discharge decision were sufficient to trigger a name-clearing hearing); *Rosenstein*, 876 F.2d at 396 (holding an appeal based upon police officer's contention that he was

"fired from the Dallas Police Department for something that [he] did not do" was "sufficient to state a request for a name-clearing hearing.").

It is undisputed that Mr. Handverger did not specifically request a name-clearing hearing. Indeed, his request for a hearing appears to be more reasonably construed as a request for a hearing to protect what he believed was a property interest in his continued employment recognized by the Supreme Court in *Loudermill*, than a request for a hearing to protect a liberty interest in his reputation. *See Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997) (terminated government employee's letter claiming termination process lacked due process "was insufficient to constitute a request for a name-clearing hearing" because it "was insufficient to alert the [employer] that [the employee] was complaining of a lack of due process in connection with a liberty interest as opposed to a lack of due process in connection with his claimed property interest, a claim which he had been asserting for some time."). Although again a close question, viewing the evidence in the light most favorable to Mr. Handverger and drawing all reasonable inferences in his favor, his September 27, 2008 letter requesting a public hearing regarding the preliminary resolution and further requesting Winooski to issue subpoenas for the signatories to the September 19, 2008 letter were sufficient to place Winooski on notice that Mr. Handverger sought to challenge the charges set forth in the preliminary resolution and thereby clear his name. For purposes of defeating summary judgment, this evidence is sufficient. *See Hemmah v. City of Red Wing*, 2008 WL 544976, at *2 (D. Minn. Feb. 26, 2008) (ruling that, when all reasonable inferences are drawn in his favor, an employee who inquired where he should submit information to contest assertions in his termination letter could reasonably be deemed to have requested an opportunity to clear his name).

### 3. *Whether Name-Clearing Hearing Was Offered.*

The only remaining question is whether a name-clearing hearing was offered. As Winooski points out, Mr. Handverger was offered an opportunity to challenge the factual statements set forth in the preliminary resolution at the September 22, 2008 City Council meeting. Because he had previously received a copy of the employees' September 19

letter and knew that it would be presented during the public comment period of the September 22 meeting, he arguably knew the nature of the charges against him and could have been prepared to contest them. At this juncture, however, Mr. Handverger had not specifically requested an opportunity to clear his name so it would be anomalous to conclude that the name-clearing hearing occurred before it was requested. It would also be inconsistent with due process to find that he should have been prepared to challenge the facts in the preliminary resolution which was issued at the meeting itself. *See Segal*, 459 F.3d at 213 ("Like any procedural due process claim, a stigma-plus claim enforces a limited but important right: the right to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)). Viewing the evidence in the light most favorable to Mr. Handverger, the September 22, 2008 City Council meeting was not an offer of a name-clearing hearing.

Thereafter, however, Winooski specifically offered Mr. Handverger a public hearing in which to clear his name. Winooski scheduled the hearing for September 30, 2008. In doing so, there is no evidence that Winooski had any knowledge that this date might present a conflict of any kind for Mr. Handverger.[14] Mr. Handverger subsequently rejected Winooski's offer of the September 30, 2008 hearing on a number of grounds, including his desire to celebrate a religious holiday with his family. Winooski immediately responded by offering to reschedule the hearing for a later date, provided Mr. Handverger agreed not to challenge the timeliness of certain future actions. Mr. Handverger rejected this offer and did not make any further hearing requests.

The purpose of a name-clearing hearing is not to challenge a termination from employment; its sole purpose is to provide a government employee with an opportunity to clear his or her name. *See Roth*, 408 U.S. at 573 n.12 ("The purpose of such notice and hearing is to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him

---

[14] Mr. Handverger could have, but did not, notify Winooski of his anticipated absence on September 30, 2008 when he forwarded to Winooski his September 27, 2008 request for a public hearing.

future employment for other reasons."); *Donato*, 96 F.3d at 633 ("A hearing must be held for the limited purpose of giving a discharged employee an opportunity to clear her name."). Winooski's initial offer of a September 30th hearing was thus in fact an opportunity for Mr. Handverger to clear his name. Winooski thereafter offered Mr. Handverger a later date for the hearing subject to certain conditions. Mr. Handverger has not demonstrated that accepting those conditions would have in any way impeded his ability to clear his name or deprived him of adequate process. *See Valmonte v. Bane*, 18 F.3d 992, 1002 (2d Cir.1994) (holding that even where the plaintiff demonstrates that the government has implicated her liberty interest, she "still must show that the procedural safeguards of her interest established by the [government] are insufficient to protect her rights").

Stated differently, Mr. Handverger had no right to insist that the name-clearing hearing be set in accordance with the Charter's removal provisions. Instead, this was effectively a condition that he unilaterally imposed on the name-clearing hearing which has no support in the law. Winooski was thus free to reject the condition and to offer a hearing at a date and time that would be convenient to Mr. Handverger but which would not prejudice Winooski's interests. It made this offer and Mr. Handverger rejected it. He did not thereafter ask for a name-clearing hearing which could have taken place after the termination of his employment. *See Segal*, 459 F.3d at 214 (In a "case involving an at-will government employee, the availability of an adequate, reasonably prompt, post-termination name-clearing hearing is sufficient to defeat a stigma-plus claim.").

In order to establish the essential elements of his stigma-plus claim, Mr. Handverger must establish that he requested and was denied a name-clearing hearing. Here, he has failed to establish this essential element of his claim and thus his § 1983 liberty interest claim cannot survive summary judgment. *See id.*, at 218 n.10 ("[W]here, as here, the plaintiff had available adequate process," in the form of an adequate hearing, "she cannot be said to have been 'deprived of due process simply because [she] failed to avail [herself] of the opportunity.'") (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996)). Winooski's motion for summary

judgment with regard to Mr. Handverger's § 1983 claim alleging a procedural due process violation in connection with a liberty interest is therefore GRANTED and the claim is hereby DISMISSED.

## CONCLUSION

For the reasons stated above, the court hereby GRANTS Winooski's motion for summary judgment with regard to Mr. Handverger's § 1983 claims, DENIES Winooski's motion with regard to Mr. Handverger's Title VII and FEPA claims, and DENIES Mr. Handverger's motion for summary judgment.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 3rd day of April, 2013.

Christina Reiss, Chief Judge
United States District Court